UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                                            :
IN RE: AMERICAN EXPRESS ANTI-STEERING                       :
RULES ANTITRUST LITIGATION                                  :      MDL No. 2221 (NGG)(RER)
                                                            :
This Document Relates to:                                   :
                                                            :
**CONSOLIDATED CLASS ACTION**                               :
                                                            :
------------------------------------------------------------x

## CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs Animal Land, Inc., Firefly Air Solutions, LLC, Il Forno, Inc., Italian Colors Restaurant, Jasa Inc., Lopez-Dejonge, Inc., and Plymouth Oil Corp., d/b/a Liberty Gas Station, on behalf of themselves and all others similarly situated, hereby allege for their Consolidated Class Action Complaint against Defendants American Express Company and American Express Travel Related Services Company, Inc. (together, "American Express" or "Amex") as follows:

## I.
## INTRODUCTION

1.    This action challenges Amex's rules preventing U.S. merchants from providing consumers with incentives to use forms of payment that are less expensive to the merchant than Amex-branded payment cards, or advising consumers of the relative costs of various payment products (the "Anti-Steering Rules.")  Merchants incur fees (known as "merchant discount fees") each time they swipe an Amex or other payment card.  In the absence of the Anti-Steering Rules, merchants would be free to offer consumers incentives to use payment products that carry lower merchant discount fees

than do Amex-branded payment cards.  If merchants were free to give consumers incentives to use less costly payment products, then Amex would face the prospect of losing business as consumers respond to these incentives, and would therefore be under pressure to reduce its merchant discount fees.  In a word, Amex would face *competition* in the markets for providing payment card acceptance services to merchants.  The Anti-Steering Rules insulate Amex from such competition.  By prohibiting merchants from informing consumers about how expensive their payment product is to the merchant and providing them incentives to switch to an alternative payment product, the Anti-Steering Rules serve to entrench Amex's position of monopoly power and allow Amex to extract grossly supracompetitive discount fees from all U.S. merchants.

2.        Separate and apart from the injury the Anti-Steering Rules inflict upon merchants, the rules ensure that merchants seeking to recoup the high fees they pay Amex have no option but to increase the overall prices they charge consumers for goods and services.  Because merchants are forced to mark up the price of goods and services generally to cover the costs of accepting Amex-branded payment products — rather than seek to recoup their costs directly from Amex Cardmembers or provide the Cardmember incentives to use a less costly payment product — the Anti-Steering Rules effectively compel users of low cost payment forms (often, the least affluent Americans) to subsidize all of the rich perquisites enjoyed by Amex Cardmembers, including frequent flier miles, free gifts and cash-back rewards.

3.        In addition, the Anti-Steering Rules flatly preclude merchants from seeking to compete with one another on the dimension of whether and how they "price" their acceptance services to consumers.  Merchants compete every day on such

dimensions as whether to charge for parking, or whether to offer free wi-fi or free shipping. The Anti-Steering Rules are in essence an edict that merchants may not likewise engage in price competition with respect to the provision of payment card acceptance services. There is no justification under the antitrust laws for imposing such a ban on competition among merchants – a restraint that is distinct from and in addition to the restraints on competition among payment card networks, which form the basis of the plaintiffs' damages claims.

4. Finally, as detailed below in the Third Claim For Relief, Amex in recent years has leveraged its market power to force merchants – as a condition of accepting American Express cards – to foreswear the ability to challenge the market-wide monopolistic practices that are the subject of the instant action. Amex's programmatic efforts to insulate itself from any action seeking a class-wide injunction against its anticompetitive rules, or from meaningful damages liability for antitrust violations, are themselves illegal as measures undertaken with the specific intent of maintaining a monopoly and as unreasonable restraints of trade.

## II.
## JURISDICTION AND VENUE

5. This Court has jurisdiction over this action under 28 U.S.C. § 1331, in that, pursuant to section 16 of the Clayton Act, 15 U.S.C. § 26, this action seeks to prevent and restrain violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

6. Venue is proper in this District, pursuant to 28 U.S.C. § 1391 and 15 U.S.C. §§ 22 and 26, because the Defendants may be found or transact business within

this District.  Further, venue is proper here because this District is the transferee District of an Order of the Judicial Panel on Multi-District Litigation, dated February 7, 2011.

**III.**

**THE PARTIES**

7.      Plaintiff Animal Land, Inc. is a corporation organized under the laws of the State of Georgia, with its principal place of business in Atlanta, Georgia, where it operates Animal Land Pet Movers and accepts American Express payment cards.

8.      Plaintiff Firefly Air Solutions, LLC is a corporation organized under the laws of the State of Minnesota, with its principal place of business in St. Paul, Minnesota, where it operates 128 Café and accepts American Express payment cards.

9.      Plaintiff Il Forno, Inc. is a corporation organized under the laws of California, with its principal place of business in Santa Monica, California, where it operates Il Forno Trattoria and accepts American Express payment cards.

10.      Plaintiff Italian Colors Restaurant is a business having its principal place of business in Oakland, California, where it accepts American Express payment cards.

11.      Plaintiff Jasa Inc. is a corporation organized under the laws of the State of Louisiana, with its principal place of business in Metairie, Louisiana, where it operates The Harbor Bar & Grill and accepts American Express payment cards.

12.      Plaintiff Lopez-Dejonge, Inc. is a corporation organized under the laws of the State of Alabama, with its principal place of business in Birmingham, Alabama, where it operates Rojo restaurant and accepts American Express payment cards.

13.      Plaintiff Plymouth Oil Corp., d/b/a Liberty Gas Station is a corporation organized under the laws of the Commonwealth of Pennsylvania, with its principal place

of business in Plymouth Meeting, Pennsylvania, where it operates Liberty Gas Station and accepts American Express payment cards.

14.     Defendant American Express Company is a New York corporation with its principal place of business in New York, New York.

15.     Defendant American Express Travel Related Services Company, Inc. is a Delaware corporation, with its principal place of business in New York, New York, and is a wholly owned subsidiary of American Express Company.  American Express Travel Related Services Company, Inc. is generally responsible for all aspects of the payment card business conducted under the American Express brand, including the operation of the American Express network.  Depending on context, as used herein, the terms "American Express" or "Amex" may refer to Defendants or the American Express network or the American Express brand.

## IV.
## CLASS ACTION ALLEGATIONS

16.     Plaintiffs bring this action as a class action under Fed. R. Civ. P. 23(b)(2) to enjoin an unlawful practice under Sections 1 and 2 of the Sherman Act, and under Fed. R. Civ. P. 23(b)(3) for monetary damages.  In addition, California merchants bring this action to redress unlawful practices under California law.

17.     Plaintiffs seek certification of (a) a damages class, comprised of all merchants that have accepted Amex-branded general purpose payment cards, during the longest period of time permitted by the applicable statute of limitations (the "Statutory Period") within the United States, and (b) an injunctive class, comprised of all merchants that currently accept such cards (together, the "Class").  The Class does not include: (i) Amex, its agents, subsidiaries or affiliates; (ii) any governmental entity; (iii) any bank

issuer of American Express branded payment cards; or (iv) Amex's eight co-brand card issuer partners -- namely, American Airlines, Costco Wholesale Corporation, Delta Airlines, Hilton Honors Worldwide, JetBlue Airways, Lowe's, Macy's and Starwoods Hotels.

18.     The members of the Class are so numerous that joinder of all members is impracticable.

19.     Questions of law or fact common to the members of the Class predominate over any questions affecting only individual members.

20.     The claims of the plaintiffs identified above are typical of the claims of the Class.

21.     Plaintiffs and their counsel will fairly and adequately represent the interests of the Class.  Plaintiffs have retained counsel who is competent and experienced in federal antitrust and class action litigation.

22.     Amex has acted and continues to act on grounds that are generally applicable to the Class, such that final injunctive relief with respect to the Class as a whole is appropriate, within the meaning of Federal Rule of Civil Procedure 23(b)(2).

23.     This class action is superior to any other method for the fair and efficient adjudication of this dispute.  There will be no extraordinary difficulty in the management of this class action.

24.     A subset of the Class (the "California Subclass"), represented by plaintiff Il Forno, Inc., is also asserting claims under California state law.  The California Subclass consists of all merchants that have accepted Amex-branded payment cards, during the Statutory Period, within California.

# V.

# FACTUAL BACKGROUND

## Industry Background

25.     When a consumer presents an Amex-branded payment card for payment, the merchant swipes the card and transmits a record of the transaction to Amex.  Amex then sends to the retailer's bank account an amount of money that is, generally speaking, equal to the transaction amount minus the "merchant discount fee" that Amex charges retailers.  For a typical retailer in many industries, that discount fee is roughly 3% of the total transaction amount.  At 3%, if a Cardmember presents an Amex-branded payment card to make a $100 purchase, the merchant will receive $97 from Amex, and Amex will bill its Cardmember for $100.  The $3 difference is Amex's "discount revenue."

26.     Other payment products are far less costly to the merchant.  Debit cards, Discover-branded credit cards, and even most Visa- and MasterCard-branded payment cards carry much lower discount fees than Amex.  As a result, if merchants were able to steer transactions to payment products other than Amex, they would realize significant savings.  In a competitive retail marketplace, those savings will be passed along to all consumers in the form of lower everyday prices.

## The Anti-Steering Rules

27.     There are many ways that a merchant might steer transactions to a less costly payment product, including:

- offering a discount for using a payment product that is cheaper to the merchant, such as Discover, Visa, and MasterCard branded credit cards, while not offering that discount for Amex cards, or any particular type of Amex cards;

- verbally asking customers if they would mind using a different payment product, as opposed to Amex cards, or any particular type of Amex cards;

- posting signage indicating a preference for a cheaper payment product;

- posting the decals and signs of less expensive payment networks and yet not posting the decal or sign of Amex;

- imposing a small charge (sometimes referred to as a "surcharge") for using all or any subset of Amex-branded payment cards (where the merchant is located in one of the 40 states and the District of Columbia where such surcharges are legal); and

- taking any other actions that merchants may yet devise if they were not constrained by the anticompetitive rules against steering.

28.     Amex's Anti-Steering Rules, however, strictly prohibit merchants from engaging in any of these pro-competitive practices.  As set forth in the "Merchant Reference Guide-U.S." that Amex commenced publishing on its website in or around 2007:

Merchants must not:

o indicate or imply that they prefer, directly or indirectly, any Other Payment Products over our Card,

o try to dissuade Cardmembers from using the Card,

o criticize or mischaracterize the Card or any of our services or programs,

o try to persuade or prompt Cardmembers to use any Other Payment Products or any other method of payment (e.g., payment by check),

o impose any restriction, conditions, or disadvantages when the Card is accepted that are not imposed equally on all Other Payment Products, except for ACH funds transfer, cash, and checks,

o engage in activities that harm our business or the American Express Brand (or both), or

o   promote any Other Payment Products (except the Merchant's own
private label card that they issue for use solely at their Establishments)
more actively than the Merchant promotes our Card.

29.     The term "Other Payment Products" is defined to mean "any charge,
credit, debit, stored value or smart cards, account access devices or other payment cards,
services or products other than the [American Express] Card."  Accordingly, a merchant
may not offer a discount for the use of an inexpensive payment card if it does not also
offer the same exact discount for the use of an expensive Amex card.  Nor may the
merchant assess a charge for processing an American Express card transaction unless that
merchant also imposes the same charge for processing a debit card transaction –
something no merchant would ever consider, as debit transactions cost the merchant only
a small fraction of what Amex transactions do.

30.     The above iteration of Amex's Anti-Steering Rules, taken from the
Merchant Payment Guide, is substantially mirrored in American Express's card
acceptance agreements with all U.S. merchants.

31.     The intended and actual result of Amex's Anti-Steering Rules is near-total
insulation from price-based competition in the payment card acceptance services
markets.  A competitor network — such as Discover Network or a new market entrant —
may offer to provide comparable services to retailers at a price far lower than that
charged by Amex.  Such a pro-competitive strategy, however, will not allow this would-
be competitor to gain any market share from Amex.  The reason that the competitor
network cannot gain market share by offering the same services at lower prices is because
of the Anti-Steering Rules, which flatly ensure the consumer will have no incentive to
use the less expensive and more efficient payment medium.  And it is the consumer who

decides which payment option to use.  The Anti-Steering Rules thus render Amex largely impervious to price-based competition in the provision of payment card acceptance services.

32.     In the absence of Amex's Anti-Steering Rules, moreover, the fees that Amex is able to charge merchants for processing transactions on the Amex payment card network would be greatly diminished.  Merchants would incur lower fees and pass along the benefits to consumers in the form of lower prices.

33.     Further, beyond achieving the benefits that the merchant plaintiffs are seeking in this action, the abolition of the Anti-Steering Rules would enable debit card users, cash payers and other consumers to avoid the cost of all the frequent flier miles, Membership Rewards Points®, travel insurance and other perquisites that are financed, at least in part, out of merchant discount fees.  Presently, the benefits enjoyed by Amex Cardmembers are subsidized by all consumers, as well as merchants.  If the merchant were free to offer inducements to use less expensive payment forms – or, conversely, to assess a surcharge for using expensive payment products – then *only* customers who nonetheless choose to use an expensive payment product would be compelled to pay for the privilege.  While an affluent shopper who is 200 points shy of a free trip to Hawaii may not balk at a two dollar surcharge on her check-out ticket, the cash-payer and debit card user will be relieved of the obligation to subsidize that particular junket.

**Market Definition and Market Power**

34.     Under any appropriate definition of a relevant product market in this case, American Express has substantial market power or monopoly power.

### i.     *American Express Card Acceptance Services Market*

35.     There exists a relevant product market consisting of the services provided to merchants for accepting American Express payment cards.  As a result of the challenged Anti-Steering Rules, American Express's ability to impose supra-competitive prices upon merchants is not meaningfully constrained by price competition from other payment networks.  If Amex increases merchant prices significantly over a competitive baseline – or if a competitor network, such as Discover or MasterCard, drops its merchant fees by a significant amount – the merchant plaintiffs have no ability to steer transaction volume away from the expensive Amex network over to the now-cheaper competitor network.  In a properly functioning market, Amex could not raise its prices above a competitive baseline without having transaction volume migrate to less expensive networks.  In economic terms, then, there is extraordinarily low cross-elasticity of demand as between American Express acceptance services and those offered by other networks.  As a result, the product dimension of the relevant market is properly limited to acceptance services for the American Express network.

36.     American Express has monopoly power in the market for American Express card acceptance services.

### ii.     *Corporate and Small Business Card Services Markets*

37.     There further exist relevant markets, the product dimensions of which are no broader than all corporate and small business card acceptance services.

38.     The majority of Amex's corporate card holding customers – generally, large corporations – mandate that their executives must use the American Express corporate card if they wish to be reimbursed for their business expenses.  Amex itself

fosters such policies by its clients, which it refers to as "mandated usage" policies. Many more cardholding companies encourage their executives to use the Amex corporate card for reimbursable expenses. When companies mandate, or even encourage, use of the corporate card in this way, cardholding executives become extraordinarily insistent on using their corporate card. Amex then touts these usage policies and cardholder insistence to merchants, in seeking to justify its high discount fees. The result is that, from the standpoint of merchants, other payment products are not ready substitutes for corporate card acceptance. Cross-elasticity of demand as between corporate card acceptance services and other acceptance services is extraordinarily low.

39. Small business cards similarly generate highly inelastic demand due to features such as management reporting and account expense tracking; discounts for typical business expenses; special insurance programs; and robust rewards programs. In addition, small business charge and credit cards are a source of capital for small businesses. According to American Express, the two core needs of small businesses are managing their cash flow and access to information that could help them better manage and grow their business. Small business cards meet both these needs in ways that other cards do not.

40. American Express has substantial market power or monopoly power in the markets for corporate and small business card acceptance services. Courts sometimes recognize that a high share of a relevant market constitutes evidence of market power in that market. On that measure, Amex's market power is clear. During the Statutory Period, Amex's share of a multi-brand corporate card market has been in the vicinity of 70%, while its share of small business cards was consistently above 45%.

### iii. General Purpose Credit and Charge Card Services Market

41.     Irrespective of the definition of the relevant market – i.e., even if one defines the relevant product market so broadly as to include all credit and charge card services provided to merchants – American Express has market power.

42.     Amex has demonstrated its market power throughout the relevant period by: maintaining supracompetitive discount rates; charging significantly different prices to different groups of merchants for reasons unrelated to the cost of providing service; establishing prices without regard to the cost of providing service; managing to raise or maintain prices as sales volume increased substantially; forcing merchants to accept the collective action ban provisions described below in the Third Claim For Relief; and forcing merchants to accept the Anti-Steering Rules themselves.

43.     There have existed at all relevant times substantial barriers to entering the payment card network business.  The challenged rules foreclose what would otherwise be the most likely and obvious route to entry – viz., the provision of acceptance services to merchants at prices (i.e., discount rates) that are below those of competitor networks.  For this and other reasons, there have been no successful new entrants in the U.S. credit card network business for over a quarter century – a staggering period of time in any industry.

### iv. Geographic Dimension

44.     The geographic dimension of each of the above-referenced relevant product markets is the United States.

### Nature of the Injuries to the Class

45.     The Anti-Steering Rules injure merchants because, in the absence of those rules, merchants would have the option to steer cardholders to cheaper forms of payment

or recoup the costs of Amex card acceptance. The challenged rules deprive each merchant member of the Class of this valuable option.

46. The rules further injure merchants because they insulate Amex from price-based network competition, thereby enabling Amex to extract supra-competitive discount fees. But for the Anti-Steering Rules, Amex would be compelled to, and would in fact, charge merchants lower discount fees than it presently does. The rules thus inflict upon merchants injury in the form of overcharge, representing the difference between (i) the fees incurred by merchants for processing transactions on cards that are subject to Amex's Anti-Steering Rules, and (ii) the fees that would have been incurred on those transactions but for Amex's maintenance of the Anti-Steering Rules – i.e., if Amex had at all relevant times been exposed to price competition with other payment networks.

47. Over time, moreover, American Express has inflicted new and accumulating injury on merchants, as it has issued new cards and launched new card products subject to the Anti-Steering Rules, and as it has enlisted U.S. banks and other financial institutions to issue cards to run on the American Express network subject to Amex's Anti-Steering Rules.

48. Among other things, over the course of the past decade or so, Amex has undertaken a series of major initiatives designed to cause consumers who lie outside Amex's traditional base of corporate and relatively affluent consumers to use Amex-branded credit cards for their everyday purchases. As a result of Amex's actions in launching and then promoting these mass-market products – including the "Blue" family of revolving credit cards and the co-branded Amex-Costco credit cards, among other products– many consumers that would otherwise have made purchases using other

networks' credit cards, which are relatively less expensive to merchants, have instead made the same purchases using Amex's mass market credit cards, which carry the same high merchant fees as Amex's corporate, small business and premium charge cards. Merchants thus incur significantly higher acceptance costs for the same transaction. And because of the Anti-Steering Rules, merchants are unable to avoid these higher costs through the standard mechanism of pricing, or indeed through any mechanism other than discontinuing acceptance of American Express cards altogether – a course of action that is theoretically possible, but not commercially feasible for most merchants.

49. Having finally established itself as a viable mass-market revolving credit card brand, Amex began in late 2004 to enlist U.S. banks to issue Amex-branded credit cards subject to the Anti-Steering Rules. In 2004, Amex entered into a card issuing relationship with MBNA (which has since been acquired by Bank of America). The new Amex-branded MBNA credit cards were issued with the clear understanding that their use would be governed by American Express's Anti-Steering Rules, thus allowing Amex to price those cards to merchants at the same high level as Amex's traditional corporate and charge cards, and at levels significantly higher than those garnered by identical MBNA cards issued on other networks. For its part, MBNA issued the new Amex-networked card to the same customer base as its MasterCard and Visa branded cards. The net result – because of the Anti-Steering Rules -- was that merchants paid more for the same transactions by the same customers on MBNA-issued cards.

50. Subsequently, Amex reached substantially similar issuing agreements with other third party issuers, including Citibank (2005), USAA Federal Savings Bank (2006), Bank of America (2006), Barclay's/Juniper Bank (2006), HSBC (2006), GE Money Bank

(2006) and Pentagon Federal Credit Union (2009). Because of the Anti-Steering Rules that insulate Amex from competing with respect to merchant discount pricing, all of these issuing deals brought new and accumulating injury to merchants, as transactions migrated from standard Visa and MasterCard credit cards to much higher priced Amex cards. But for the Anti-Steering Rules, American Express and its bank issuer partners would not have been able to launch any of these credit card products at discount rates that exceeded the rates charged by competitor networks for comparable products.

51.     In addition, because of Amex's rules, all of these bank issuing deals inflicted an entirely different form of injury upon merchants and their customers – namely, they precipitated an escalation of merchant fees *on rival networks*, as well as Amex's. That is, because Amex enlisted banks to issue cards subject to the Anti-Steering Rules, merchants incurred higher fees on the Visa and MasterCard networks, quite separate and apart from the increased cost of transactions migrating to Amex. The reason is straightforward: Faced with possible mass defections from its bank issuers, who stand to receive a cut of Amex's supracompetitive discount fees by issuing cards on the Amex network, Visa and MasterCard responded by raising their own merchant rates, and shifting their issuing volume to high-merchant fee card products. Thus, in justifying a major Visa merchant fee hike in 2004, Visa's merchant pricing chief William Sheedy pointed to the MBNA announcement and "American Express' appeal to banks based on higher merchant fees," referring to "American Express' open invitation to banks [as] a competitive challenge that would take more money to counter."

52.     In response, Amex has raised its own prices or has forgone cutting its rates where it otherwise might have. The result has been an upward spiral of escalating prices

that would not be possible but for the Anti-Steering Rules. And because all of these networks have been protected by substantially similar Anti-Steering Rules, the usual forces of competitive economics are unavailable to drive prices down.

53.     As a direct and foreseeable result of Amex's enforcement of its Anti-Steering Rules, merchants have suffered damages in an amount to be established at trial.

**Other Effects Of the Anti-Steering Rules**

54.     In addition to the harms they inflict on Class members and upon competition in the relevant product markets at issue in this case, the Anti-Steering Rules have the effect of compelling the users of low-cost payment forms – many of whom could not afford and would not qualify for an Amex rewards card – to subsidize all of the perquisites enjoyed by American Express Cardmembers. The Anti-Steering Rules, and consequently high merchant discount rates, further have the effect of increasing consumer prices in general, as set forth above. In addition, but for Amex's Anti-Steering Rules, merchants would compete on the dimension of whether and how to discount, charge for or otherwise price acceptance services. The Anti-Steering Rules operate as an edict flatly prohibiting merchants from engaging with one another in price competition with respect to payment card acceptance services.


**FIRST CLAIM FOR RELIEF**

*On Behalf Of All Plaintiffs, For Violation Of Sherman Act Section One,*
*Based On The Anti-Steering Rules*

55.     Plaintiffs repeat and reallege each of the foregoing allegations as though fully set forth herein.

56.     Section One of the Sherman Act prohibits contracts in restraint of trade. Among other things, it prohibits a defendant from exercising market power to impose anticompetitive vertical restraints.

57.     Amex has and exercises market power in the relevant markets identified above.

58.     The Anti-Steering Rules, imposed upon every member of the Class by Amex, represent an unlawful contract in restraint of trade.  Among other things, the Anti-Steering Rules represent a vertical restraint that has the clear effect of restraining *inter*brand (i.e., horizontal) competition in the markets for payment card acceptance services.

59.     The Anti-Steering Rules are anticompetitive.  Among the anticompetitive effects are the entrenchment of Amex's market position and the insulation of Amex against any competitive threat from a rival offering cheaper or more efficient payment card services.

60.     There exists no procompetitive justification for the Anti-Steering Rules in any of the relevant markets set forth above.

61.     As a direct and foreseeable result of Defendants' willful imposition of the Anti-Steering Rules, the Class has suffered damages in an amount to be determined at trial.

62.     As a direct and foreseeable result of Defendants' willful imposition of the Anti-Steering Rules, the Class continues to suffer irreparable injury for which there is no adequate remedy at law.

63.     Defendants' imposition and enforcement of the Anti-Steering Rules is likely to continue if not enjoined.

## SECOND CLAIM FOR RELIEF

*On Behalf Of All Plaintiffs, For Violation Of Sherman Act Section Two,*
*Based On The Anti-Steering Rules*

64.     Plaintiffs repeat and reallege each of the foregoing allegations as though fully set forth herein.

65.     Section Two of the Sherman Act prohibits anticompetitive acts undertaken to maintain or achieve monopoly power.

66.     Amex has and exercises monopoly power in the market for American Express payment card acceptance services, as set forth above.  Alternatively, American Express has and exercises monopoly power in a multi-brand market for corporate card services, as set forth above.

67.     The Anti-Steering Rules further and protect Amex's monopoly power by ensuring that no competitor can make inroads on its market position by offering cheaper or more efficient payment card services to merchants.

68.     The Anti-Steering Rules harm the competitive process, harm consumers, and are not supported by any procompetitive justification.

69.     Amex's willful maintenance of monopoly power by the anticompetitive device of the Anti-Steering Rules constitutes a violation of Section Two of the Sherman Act, 15 U.S.C. § 2.

70.     As a direct and foreseeable result of Amex's willful maintenance of monopoly power in the markets identified above by the anticompetitive device of the

Anti-Steering Rules, the Class has suffered damages in an amount to be determined at trial.

71.     As a direct and foreseeable result of Amex's willful maintenance of monopoly power in the markets identified above by the anticompetitive device of the Anti-Steering Rules, the Class continues to suffer irreparable injury for which there is no adequate remedy at law.

72.     Defendants' imposition and enforcement of the Anti-Steering Rules is likely to continue if not enjoined.

## THIRD CLAIM FOR RELIEF

*On Behalf Of All Plaintiffs, For Violation Of Sherman Act Sections One and Two, Based On The Collective Action Ban Provisions*

73.     Plaintiffs repeat and reallege each of the foregoing allegations as though fully set forth herein.

74.     In its card acceptance agreements with almost all U.S. merchants, Amex purports to insulate itself from any legal challenge that might be brought, in any litigation or arbitral setting, by two or more merchants acting collectively (the "Collective Action Bans"). These Collective Action Bans, as applied under the facts of this case, violate the federal antitrust laws.

75.     In relevant respect, Section One of the Sherman Act prohibits contracts that have the intention and effect of insulating a firm from liability for its violations of the antitrust laws, and thereby facilitating the violation of the antitrust laws. So by way of example, it would violate Section One for a firm with market power to force its

customers to agree to a blanket waiver of the right to challenge that firm's conduct under the federal antitrust laws.

76.     In relevant respect, Section Two of the Sherman Act prohibits intentional actions, other than those protected by the *Noerr-Pennington* rule, that are designed to insulate a firm against legal challenges that would have the effect of destroying that firm's monopoly power.  The instant case, including the First and Second Claims for Relief, would have the effect of destroying Amex's monopoly power by exposing it to competition, increasing the cross-elasticity of demand for Amex and other payment products, and broadening the definition of the relevant product market to the point where Amex would no longer have monopoly power.

77.     Under the Collective Action Ban provisions (which are typically but not always accompanied by an arbitration agreement), a merchant generally forfeits the ability to: (i) have its claim consolidated or aggregated with any claim asserted by any other merchant against Amex; (ii) act as a representative plaintiff in any class action; or (iii) participate even as a non-representative *member* of a class.  The Collective Action Bans thus act as prospective waivers of antitrust damages liability with respect to any market-wide anticompetitive behavior that can only be redressed by collective action on the part of direct purchasers, whether as class members or groups of individual plaintiffs.

78.     The Collective Action Bans were devised and implemented by American Express with the specific intention of immunizing itself against liability that it might otherwise incur under the antitrust laws in connection with the rules it imposes upon merchants, including the Anti-Steering Rules and the honor-all-cards rule.  It was the fear of merchant litigation challenging these specific anticompetitive practices that caused

American Express to seek and obtain from merchants waivers of the right to seek meaningful redress.

79.     Amex first began implementing Collective Action Bans in 1999, imposing them initially only on its smallest and least powerful merchants.  At that time, a merchant class action had been ongoing for several years in the Eastern District of New York challenging the "honor all cards" rule of the Visa and MasterCard networks – i.e., the rule whereby any merchant accepting Visa or MasterCard credit cards was obligated to accept Visa and MasterCard's debit card products, at merchant discount rates that significantly exceeded those charged by other debit networks.  See *In re Visa Check/Mastermoney Antitrust Litig.,* CV-96-5238 (EDNY) (JG). Taking note, Amex executives grew concerned that their own anticompetitive merchant rules would come under antitrust scrutiny, as a result of similar merchant class litigation.

80.     Accordingly, in mid-1999, Amex devised the policy of forcing all merchants who transact less than $10 million per year on the Amex network to foreswear the ability to participate in a class or group action or arbitration, or to join their claims with those of other merchants.  Amex instituted this policy by incorporating Collective Action Bans in its agreements for use with new small merchants, and by sending unilateral "envelope stuffer" mailers to existing small merchants, who were, in effect, given the choice of discontinuing Amex acceptance altogether or waiving the right to participate in any antitrust challenge to Amex's merchant practices.

81.     Despite Amex's efforts to ban collective actions that might effectively challenge its merchant rules under the antitrust laws, Amex's "honor all cards" rule was attacked in 2004 in a merchant class action led by a plaintiff who was sufficiently large

that its contract did not contain the Collective Action Ban, pursuant to Amex's policy at that time. *Marcus Corp. v. American Express,* 04 Civ. 5432 (S.D.N.Y.) (GBD). By 2005, moreover, several merchants had filed or threatened to file actions challenging the Anti-Steering Rules. At the same time, a merchant class action challenging Visa and MasterCard's anti-steering rules was the subject of highly publicized proceedings (see *In re Payment Card Interchange Fee And Merchant Discount Antitrust Litig.*, 05-MD-1720 (E.D.N.Y.) (JG)). Further, in this same time frame, several competition authorities around the world had recently ruled that, or were considering whether, anti-steering rules are anticompetitive and subject to forcible rescission or modification.

82.     In response to these developments, Amex devised a program to render itself impervious to *any attempt* by merchants to mount a broad challenge to Amex's Anti-Steering Rules. Under this program, Amex's merchant representatives, or "client managers," were directed to obtain collective action waivers from all merchants, even the largest and most powerful. Amex then set about exercising its considerable market power and demanding that its accepting merchants, as a condition of being permitted to accept American Express cards, execute waivers of the right to bring antitrust challenges on any collective basis.

83.     The resulting contractual provisions take several forms, depending upon the bargaining power of the merchant. In some cases, the merchant is required to sign away specifically, and only, the right to join the instant class action challenging the Anti-Steering Rules (or its progenitor actions) and the cases challenging the honor all cards rule referenced above. In other cases, the merchant gives up the right to act as a named class representative, but expressly retains the right to be represented as a passive member

of a class action.  But in the vast majority of cases, the merchant is required to waive the full panoply of rights to engage in collective action, just as in the small merchant form agreements.

84.     In any case, it is clear that the Collective Action Bans are not intended to govern the procedures whereby a merchant may assert a claim against American Express, but are only intended to preclude a challenge to American Express's conduct under the antitrust laws.  Where the Collective Action Ban would not have the effect of *precluding* a merchant from challenging Amex's conduct – e.g., where a merchant has sufficient damages and other interests at stake to warrant actually proceeding in a one-on-one arbitration – Amex opts to allow the claim to proceed in court jointly with the claims of any other merchants who are free of the Collective Action Ban.  In other words, American Express has no interest in the Collective Action Ban except to the extent that it *precludes* challenges to Amex's conduct under the antitrust laws.

85.     Through the Collective Action Bans, American Express has attempted to immunize itself from (a) any challenge seeking to enjoin the application of its anticompetitive rules to all merchants under Rule 23(b)(2); and (b) damages liability to all merchants, save the small handful whose economic interests may be sufficient to warrant the extraordinary expense of large-scale one-on-one antitrust litigation.  As a direct and foreseeable result, the Class stands to suffer irreparable injury for which there is no adequate remedy at law.

## FOURTH CLAIM FOR RELIEF

*On Behalf Of The California Subclass, For Violation Of The Cartwright Act,
Based On The Anti-Steering Rules*

86.     The representative of the California Subclass repeats and realleges each of the foregoing allegations as though fully set forth herein.

87.     Amex has engaged in and continues to engage in unlawful contracts in an unreasonable restraint of trade in violation of the Cartwright Act, California Business and Professional Code § 16700 et seq.  These unlawful contracts were entered into and effectuated within the State of California.

88.     The Anti-Steering Rules, which Amex imposes on and enforces with respect to every member of the California Subclass, represent an unlawful contract in restraint of trade.  Among other things, the Anti-Steering Rules represent a vertical restraint that has the clear effect of restraining *inter*brand (*i.e.*, horizontal) competition both in the markets for payment card services, and in the markets for competition between and among merchants.

89.     The Anti-Steering Rules have numerous additional anticompetitive effects, including the inflationary pressure they exert on consumer goods and services, the entrenchment of Amex's market position and the insulation of Amex against any competitive threat from a rival offering cheaper or more efficient payment card services.

90.     The Anti-Steering Rules are not necessary to accomplish a legitimate procompetitive benefit to Amex.

91.     As a direct and foreseeable result of Defendants' willful imposition of the Anti-Steering Rules, the California Subclass has suffered and continues to suffer irreparable injury for which there is no adequate remedy at law.

92.     As a direct and foreseeable result of Defendants' willful imposition of the Anti-Steering Rules, the California Subclass has suffered damages in an amount to be determined at trial.

93.     Defendants' imposition and enforcement of the Anti-Steering Rules is likely to continue if not enjoined.

WHEREFORE, Plaintiffs respectfully seek an Order:

A.     Directing that the instant claims for injunctive relief may be prosecuted as a class action, on behalf of the Class defined above, under Fed. R. Civ. P. 23(b)(2);

B.     Directing that the instant claims for damages may be prosecuted as a class action, on behalf of the Class defined above, under Fed. R. Civ. P. 23(b)(3);

C.     Declaring that American Express's Anti-Steering Rules are illegal and directing their rescission;

D.     Declaring that the Collective Action Ban provisions are unenforceable;

E.     Directing Defendants to cooperate with Plaintiffs in the establishment, funding and execution of a campaign that adequately informs merchants and consumers of the rescission of the Anti-Steering Rules;

F.     Awarding damages in an amount to be determined at trial and then trebled;

G.     Awarding attorneys' fees and costs of suit; and

H.     Granting such other and further relief as this Court may deem just and proper.

JURY DEMAND

Plaintiffs hereby demand trial by jury of all issues so triable.

Dated: New York, New York
      March 23, 2011

**FRIEDMAN LAW GROUP LLP**

/s/ Gary B. Friedman

_____
Gary B. Friedman
Tracey Kitzman
270 Lafayette Street, 14th Floor
New York, New York 10012
(212) 680-5150
gfriedman@flgllp.com

**PATTON BOGGS LLP**
Christopher W. Hellmich
Read K. McCaffrey
2550 M Street, NW
Washington, DC 20037
(202) 457-6000

**REINHARDT WENDORF & BLANCHFIELD**
Mark Reinhardt
Mark A. Wendorf
1250 East First National Bank
332 Minnesota Street
St. Paul, MN 55101
 (651) 287-2100

*Lead Counsel For The Class Plaintiffs*

*Additional Class Counsel Listed On Following Pages*

Brian Murray, Esq.
Scott Levy, Esq.
MURRAY, FRANK & SAILER LLP
275 Madison Avenue, 8th Floor
New York, NY 10016
(212) 682-1818

Karl Cambronne, Esq.
Jeffrey D. Bores, Esq.
CHESTNUT & CAMBRONNE P.A.
3700 Campbell Mithun Tower
222 South Ninth Street
Minneapolis, MN 55402
(612) 336-2922

Bernard Persky, Esq.
Eric Belfi, Esq.
LABATON SUCHAROW LLP
100 Park Avenue
New York, NY 10017
(212) 907-0868

R. Alexander Saveri, Esq.
SAVERI & SAVERI INC.
706 Sansome Street
San Francisco, California 94111
(415) 217-6810

Daniel E. Gustafson, Esq.
Jason S. Kilene, Esq.
GUSTAFSON GLUEK, PLLC
650 Northstar East
608 Second Avenue South
Minneapolis, MN 55402
(612) 333-8844

Vincent J. Esades, Esq.
HEINS MILLS & OLSON, P.L.C.
310 Clifton Avenue
Minneapolis, MN 55403
(612) 338-4605

Richard Rouco, Esq.
WHATLEY DRAKE & KALLAS LLP
2001 Park Place North
Suite 1000
Birmingham, AL 35203
(205) 328-9576

Douglas A. Millen, Esq.
Michael E. Moscovitz, Esq.
FREED, KANNER, LONDON &
MILLEN, L.L.C.
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
(224) 632-4500

Robert W. Cohen, Esq.
LAW OFFICES OF ROBERT W. COHEN
1875 Century Park, Suite 600
Los Angeles, CA 90067
(310) 282-7586

Noah Shube, Esq.
LAW OFFICES OF NOAH SHUBE
434 Broadway, Sixth Floor
New York, New York, 10013
(212) 274-8638

David Markun, Esq.
Edward Zusman, Esq.
MARKUN ZUSMAN & COMPTON LLP
465 California Street, Suite 500
San Francisco, California 94104
(415) 438- 4515

Michael Goldberg, Esq.,
Susan G. Kupfer, Esq.
GLANCY BINKOW & GOLDBERG LLP
455 Market Street, Suite 1810
San Francisco, CA 94105

Eugene A. Spector, Esq.
William G. Caldes, Esq.
SPECTOR ROSEMAN  KODROFF &
WILLIS P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
(215) 496-0300

Robert C. Schubert, Esq.
Willem F. Jonckheer, Esq.
SCHUBERT & REED, LLP
Two Embarcadero Center, Suite 1600
San Francisco, CA 94111
(415) 788-4220

Ronen Sarraf, Esq.
Joseph Gentile, Esq.
SARRAF GENTILE LLP
116 John Street, Suite 2310
New York, NY  10038
(212) 868-3610

Blaine H. Bortnick, Esq.
LIDDLE & ROBINSON, L.L.P.
800 Third Avenue
New York, New York  10022
(212) 687-8500

Damon Chargois, Esq.
CHARGOIS MASHAYEKH & HERRON
LLP
2201 Timberlock Place, Suite 110
The Woodlands, TX  77380
(281) 444-0604

Klari Neuwelt, Esq.
LAW OFFICE OF KLARI NEUWELT
110 East 59th Street
22nd Floor
New York, NY  10022
(212) 593-8800

Steven J. Greenfogel, Esq.
Robert Skirnick, Esq.
MEREDITH COHEN GREENFOGEL &
SKIRNICK, P.C.
1521 Locust Street, 8th Floor
Philadelphia, PA  19102
(215) 268-7641